CORRECTED

# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 19-1150V

| | |
|---|---|
| RICHARD PARSONS,<br><br>               Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: November 30, 2023 |

*Matthew F. Belanger*, Faraci Lange LLP, Rochester, NY, for Petitioner.

*Tyler King*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On August 8, 2019, Richard Parsons filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that that he suffered a left shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on October 23, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons set forth below, I find that Petitioner is entitled to a damages award in the amount of **$90,000.00 for actual pain and suffering, plus $1,416.18 in actual unreimbursable expenses.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

### I.     Relevant Procedural History

Following the initial status conference on October 16, 2019, Respondent was directed to determine his position in this case. Scheduling Order, issued Oct. 16, 2019 (ECF No. 13). On November 16, 2020, Respondent stated that he was amenable to informal settlement (ECF No. 22). The parties negotiated, but reached an impasse (ECF No. 27). After briefing, I determined that the onset of Petitioner's pain occurred within 48 hours of vaccination, and that Petitioner was entitled to compensation (ECF No. 38). The parties negotiated, but again were unable to agree on damages (ECF No. 42).

On February 21, 2023, Petitioner filed a damages brief (ECF No. 50). Respondent reacted on April 5, 2023 (ECF No. 51). The matter of damages is now ripe for resolution.

### II.    Relevant Medical History

On October 23, 2017, Petitioner received the flu vaccine intramuscularly in his left arm. Ex. 2 at 2. Two days later, on October 25, 2017, Petitioner was seen by physician assistant ("PA") Christine Rodgers at Churchville Family Medicine, his primary care provider ("PCP"), to follow up on an October 9, 2017 emergency department ("ED") visit for chest pain. Ex. 3 at 41. PA Rodgers noted that Petitioner's labs and EKG were checked at the ED and were found to be normal, and that his chest pain had resolved in 24-48 hours. *Id.* The review of systems section of the record does not contain any positive reports, and does not contain any indication that musculoskeletal symptoms were reported. *Id.* The examination section does contain a musculoskeletal note but states only "[w]alks with a normal gait." *Id.* at 42. The record is otherwise silent on any arm or shoulder concerns. *Id.* at 41-43. Petitioner was assessed with chest pain that resolved after three days and hyperlipidemia, which was not a new concern. *Id.* at 42-43.

On November 6, 2017 – two weeks after vaccination – Petitioner returned to Churchville Family Medicine, where he was seen by Dr. Christopher Khamphoune and now reported left shoulder pain for two weeks. Ex. 3 at 140-141. Petitioner specified that the pain "started after his flu vaccine given at Wegmans." *Id.* at 140 ("2wks ago Wegmans flu shot still has issues with shoulder pain non stop since flu shot"). On examination, his left shoulder exhibited normal active and passive range of motion ("ROM") and no masses, erythema, swelling, warmness, or skin lesions. *Id.* at 141. Petitioner was assessed with left shoulder pain of unclear etiology. *Id.* He was advised to try non-steroidal anti-inflammatory medications, and referred to an orthopedist for "severe left shoulder pain." *Id.*

Three weeks later (November 27, 2017), Petitioner saw orthopedist Dr. John Gibbs for left shoulder pain. Ex. 7 at 1. Petitioner reported that he had a flu shot at Wegmans on October 23, 2017, and "has had ongoing pain that has not improved." *Id.* Petitioner reported that he had no preexisting left shoulder problems and his left shoulder was fine

2

prior to the injection. *Id.* On examination, Petitioner's left shoulder had "mild tenderness at the region he reports was the injection site." *Id.* at 2. His left shoulder demonstrated "good range of motion about the elbow, wrist and hand." *Id.* Dr. Gibbs documented Petitioner's left shoulder active ROM in forward flexion as 170 (compared to 175 on the right), and abduction as 150 (compared to 175 on the right). *Id.* Petitioner was assessed with left shoulder pain. *Id.* Dr. Gibbs explained that the treatment options included injection, physical therapy ("PT"), continued conservative measures with ice and anti-inflammatories, and further imaging. *Id.* Dr. Gibbs and Petitioner decided to proceed with an MRI. *Id.*

On December 20, 2017, Petitioner underwent a left shoulder MRI. Ex. 5 at 2. The MRI revealed mild teres minor tendinosis with subjacent posterior humeral head marrow edema and trace overlying intermuscular fluid, as well as mild osteoarthritis. *Id.* Petitioner then returned to orthopedist Dr. Gibbs on December 28, 2017. Ex. 4 at 4. Dr. Gibbs reviewed the MRI findings and strongly recommended PT. *Id.*

On January 10, 2018, Petitioner attended a PT evaluation of his left shoulder. Ex. 6 at 27. The record lists the onset date of his injury as October 23, 2017, and states that Petitioner reported shoulder pain after a flu shot received that same date. *Id.* He described a burning pain around his left shoulder, with the pain at its worst when sleeping at night. *Id.* He was unable to put pressure on his left arm or lean on things, and had increased pain and difficulty with getting dressed, reaching, lifting, pulling, and his work duties as a veterinarian. *Id.* He had been feeling "a little better" recently. *Id.* On examination, his left shoulder active ROM was 95 degrees in flexion, 55 degrees in abduction, and 41 degrees in extension. *Id.* His passive ROM was 96 degrees in flexion and 68 degrees in both internal and external rotation. *Id.* He had positive impingement results on the Hawkins/Kennedy and Neer tests. *Id.* at 28. His passive joint mobility exhibited "slight" to "considerable" restriction. *Id.* The physical therapist stated that Petitioner had signs and symptoms consistent with left shoulder capsular hypomobility producing decreased ROM and pain, and recommended that Petitioner attend PT twice weekly for six weeks. *Id.*

Petitioner continued PT for a total of eight visits through March 21, 2018. Ex. 6 at 3-25. At his second and third PT visits, he reported soreness but improved ROM. *Id.* at 21, 24. At the following visit on January 31, 2018, he said he had been sore for a week after the prior visit, and had decreased ROM, increased edema, and poor tolerance to exercises. *Id.* at 18. His active ROM was 86 degrees in flexion and 57 degrees in abduction. *Id.* Thereafter, however, his ROM began improving, though it remained restricted. *Id.* at 3-15. On February 14, 2018, his passive ROM was 117 degrees in flexion, 55 degrees in external rotation, and 30 degrees in internal rotation. *Id.* at 12.

Petitioner returned to Dr. Gibbs on February 2, 2018. Ex. 4 at 13. He reported that PT had helped "moderately," and that his home exercise program seemed to help. *Id.* However, he still had residual symptoms, mainly pain. *Id.* Dr. Gibbs thought his injury "may require several months for maximum improvement." *Id.* On examination, his left

3

shoulder active ROM was 175 degrees in forward flexion and 160 degrees in abduction. *Id.* at 16. Dr. Gibbs reviewed the MRI again and noted that Petitioner had "seen improvement of his range of motion" but had "residual pain." *Id.* Dr. Gibbs was optimistic that Petitioner would have a good result, but warned that he may be left with long term symptoms including pain. *Id.* at 16-17. Dr. Gibbs offered a steroid injection, which Petitioner declined, and told him diagnostic arthroscopy was an option if Petitioner's symptoms persisted or worsened. *Id.* Dr. Gibbs offered the option of seeking a second opinion with an orthopedic surgeon, but Petitioner wished to hold off on this. *Id.* For the time being, Dr. Gibbs recommended that Petitioner continue PT. *Id.*

At Petitioner's seventh PT session on February 21, 2018, his passive ROM was measured at 138 degrees in flexion, external rotation was 50 degrees, and internal rotation was 58 degrees. Ex.6 at 8. At his final session a month later, he was still "very sore" and had pain with reaching and use of his left arm. *Id.* at 3. His passive ROM was 149 degrees in flexion, 74 degrees in external rotation, and 64 degrees in internal rotation. *Id.*

Petitioner returned to Dr. Gibbs for a follow-up appointment on April 30, 2018. Ex. 4 at 25. On examination, Petitioner's left shoulder active forward flexion was 160 degrees, with active abduction to 100 degrees, compared to 175 degrees for both on his right side. *Id.* Impingement signs were mildly positive at 90 degrees of forward flexion and abduction. *Id.* Petitioner was assessed with left shoulder pain. *Id.* The record states that Petitioner would consider a steroid injection or potential diagnostic arthroscopy, but preferred to hold off on further treatment for the time being. *Id.* at 29.

Petitioner did not seek care for his shoulder again until nine and a half months later, on February 13, 2019, when he returned to his PCP reporting persistent "awful" pain and decreased ROM, and requesting another MRI. Ex. 3 at 204. He was having difficulty with certain movements and procedures in his work as a veterinarian. *Id.* On examination, he had a tender mass on his left deltoid, and his ROM was limited by pain. *Id.* at 205.

An ultrasound of Petitioner's left shoulder was done on March 1, 2019. Ex. 3 at 201. The ultrasound did not show abnormalities, fluid collections, fat necroses, or masses. *Id.*

Two months later (May 6, 2019), Petitioner returned to Dr. Gibbs for persistent left shoulder pain. Ex. 3 at 181. The pain was a "constant ache," with occasional sharp pain, and was affecting his daily activities. *Id.* On examination, his left shoulder active ROM was 150 degrees in forward flexion and 130 degrees in abduction. *Id.* at 184. Impingement signs were "strongly positive" at 90 degrees of forward flexion and abduction. *Id.* An MRI was ordered. *Id.* Thereafter, Petitioner did not receive medical treatment for his shoulder for the next eighteen months.

A second MRI was done on November 13, 2020. Ex. 12 at 1. It showed tendinosis (but no tear) of the infraspinatus and subscapularis tendons and an anterior labral tear,

4

but no bursal fluid collections. *Id*. There are no records of treatment for Petitioner's shoulder for the next two years.

Two years after his second MRI (December 19, 2022), Petitioner returned to Dr. Gibbs to follow up on his left shoulder pain. Ex. 16 at 5. He reported a pain level of five out of ten, with pain affecting his everyday activities. *Id*. at 8. The pain was "dull and achy," radiating, and burning, and he noted weakness as well. *Id*. He had no significant improvement with rest, heat, and anti-inflammatory medications. *Id*. On examination, his left shoulder active ROM was 165 degrees in forward flexion and 150 degrees in abduction, with moderately positive impingement signs. *Id*. at 12. Dr. Gibbs assessed him with impingement syndrome of the left shoulder, and ordered another MRI, recommending ice and anti-inflammatory medications as needed for symptom control. *Id*. at 13.

On December 28, 2022, Petitioner had a third MRI. Ex. 17. The MRI showed mild subacromial subdeltoid bursitis and degenerative arthrosis, with an intact rotator cuff. *Id*. at 1-2. No further treatment records have been filed.

### III.    Affidavit Evidence

Petitioner filed six affidavits in support of his claim. Exs. 1, 9, 10, 11, 14, and 15. Petitioner states that he is a veterinarian, operates a farm with his wife, and is a pastor. Ex. 15 at ¶ 5. Prior to the October 2017 flu vaccination he was active, running his own veterinary hospital, managing livestock including large beef cattle, and doing farm work such as moving heavy feed bags, stacking "hundreds" of bales of hay, cleaning stalls, repairing fences, and handling most heavy work on his farm. *Id*. at ¶ 7 He also handled most basic maintenance tasks for his home, veterinary clinic, and church including snow removal, lawn maintenance, and other upkeep. *Id*.

Petitioner developed a "throbbing pain at the injection site" within two hours of receiving the October 23, 2017 flu vaccine. Ex. 1 at ¶ 5. The pain came from the shoulder joint rather than the deltoid muscle, and progressed over several days to a sharp, stabbing pain with intense burning. *Id*. As the pain progressed, his left shoulder ROM was affected. *Id*.

Although his pain was intense, at first he did not think it was abnormal and expected it to alleviate with time. Ex. 1 at ¶ 6. Instead, it progressed to a sharp and stabbing pain that prevented him from moving his shoulder through a normal range of motion. Ex. 15 at ¶ 9. At this point, he knew his symptoms were not normal, so he called his PCP and was scheduled to be seen on November 6, 2017. *Id*. at ¶ 10. When he was seen at his PCP's office on October 25, 2017, he mentioned his left shoulder pain to the

5

PA. Ex. 11 at ¶ 5. Petitioner recalls that they discussed that the pain should go away with time and there was nothing to worry about. *Id.*

He stopped PT in March 2018 after eight sessions because he was frustrated that it had provided only limited relief and was no longer helping. Ex. 15 at ¶¶ 13-14. However, he continued to do his home exercises. *Id.* at ¶ 14. At this point, he continued treatment with Dr. Gibbs and his PCP for a time. *Id.* at ¶ 15. However, after Dr. Gibbs told him in April 2018 that he might be left with permanent pain and loss of function, he decided to continue with conservative measures rather than pursue the "more invasive options of having surgery or steroid injection." *Id.* at ¶¶ 15-16. During this gap in formal treatment, he continued doing shoulder exercises, using anti-inflammatory pain medication, and modifying activities in hopes of restoring his activity level to where it was before vaccination. *Id.* at ¶ 16.

Despite ten months of conservative measures, his shoulder did not improve, so he returned to his PCP in February 2019. Ex. 15 at ¶ 17. His PCP ordered an ultrasound, which was negative. *Id.* at ¶¶ 17-18. He then returned to Dr. Gibbs, who ordered an MRI. *Id.* at ¶ 18. However, initially his insurance "would not authorize another MRI, so I did not actually have another left shoulder MRI until November 2020." *Id.* at ¶ 19. After he finally had the second MRI, Dr. Gibbs offered shoulder surgery as an option, but Petitioner "researched outcomes of surgical procedures for adhesive capsulitis and bursitis, and [was] concerned that such a surgery would side line me for several months or longer with no guarantee that I would be any better and a chance that I would be worse." *Id.* For these reasons, he decided against surgery. *Id.*

Petitioner has "constant, nagging left shoulder pain every minute of every day that gets worse with lifting, reaching away from my body or behind me – all of which are movements that I must perform every day to perform my work as a veterinarian and to conduct work at the farm." Ex. 15 at ¶ 20. His shoulder especially bothers him at night, when it is difficult to fall asleep and he wakens periodically during the night from pain. *Id.* at ¶ 21. Daily activities such as washing his hair, reaching behind his back to get dressed, or hugging his wife are "daily painful reminders that my left shoulder is not normal." *Id.* He returned to Dr. Gibbs in December 2022 because his shoulder pain was getting worse. *Id.* at ¶ 22.

As he approaches retirement, his plan was to build his farm business and continue it in retirement. Ex. 15 at ¶ 23. Unfortunately, after his shoulder injury he was no longer able to properly manage and care for a herd of cattle, and it did not make financial sense to hire someone else to do it. *Id.* Thus, he sold off the cattle and "dramatically scaled back the scope of the farm as well as its economic potential," which has made it difficult to reach a sales threshold that qualifies the farm for a state property tax reduction. *Id.* Petitioner concludes that before the October 2017 flu shot, he was a "very physically active and relatively healthy man" who ran a thriving veterinary practice and operated a

farm and church. *Id.* at ¶ 24. He feels that his left shoulder injury and chronic pain have "weakened me considerably," reducing his physical abilities and aging him. *Id.*

Jacob Parsons, Petitioner's son, states that he is a pharmacist at a Wegman's Pharmacy, and in October 2017 was in his second year of a college pharmacy program. Ex. 9 at ¶ 2. He saw Petitioner on the day of the flu shot, October 23, 2017, and recalls Petitioner telling him that the pharmacist placed the needle too high on Petitioner's shoulder and may have injected the vaccine into the bursa rather than the deltoid muscle. *Id.* Jacob Parsons recalled seeing that the band-aid covering the vaccine injection site was very high up on Petitioner's left shoulder near his shoulder joint. *Id.*

Marla Parsons, Petitioner's spouse, received a flu shot at the same clinic as Petitioner. Ex. 10 at ¶¶ 1-2. She recalls that Petitioner told her his vaccine injection was given high on his left shoulder and showed her the band-aid covering the injection site, which was close to the top of his arm. *Id.* at ¶ 3. Later that evening, Petitioner complained to her of left shoulder pain that was more than he expected from a flu shot. *Id.* at ¶ 4. The next day, he continued to complain of pain, which concerned her. *Id.*

In more than twenty years of living and working with Petitioner, she did not recall him ever having any left shoulder issues until the October 2017 flu shot. Ex. 14 at ¶ 4. Since that time, however, he has had "chronic left shoulder pain that makes it difficult for him to sleep through the night, to take care of the house and farm and to perform his veterinary duties at the level he was accustomed to prior to this flu shot." *Id.* He generally does not complain, but since the October 2017 flu shot he has complained frequently about his left shoulder and how it limits what he can do. *Id.* at ¶ 5. They have had to curtail their vision for their farm because caring for and feeding farm animals entails lifting heavy hay bales and feed bags, which Petitioner can no longer do. *Id.* at ¶ 6. Their sons help when they can, but cannot replace the work Petitioner used to do. *Id.* They sold their cattle herd because Petitioner could no longer do what was needed to maintain the herd. *Id.* Petitioner's injury and resulting chronic pain have also taken a toll on his normally positive outlook on life. *Id.* at ¶ 7.

### IV.   The Parties' Arguments

Petitioner proposes an award of $95,000.00 for actual pain and suffering. Petitioner's Damages Motion, filed Feb. 21, 2023, at *2 (ECF No. 50) ("Mot."). Petitioner cites *Accetta v. Health & Human Servs.*, No. 17-1731V, 2021 WL 1718202 (Fed. Cl. Spec. Mstr. Mar. 31, 2021) (awarding $95,000.00 in pain and suffering), in support of his claimed award. Mot. at *11. Petitioner asserts that his pain was "severe enough to affect his ability to sleep, to do his job as a veterinarian, to take care of the family farm business and to adversely affect his normally positive outlook on life." *Id.* at *12. Petitioner emphasizes

that the pain was severe enough for him to comment on it to his wife and oldest son, and seek medical treatment just 14 days after vaccination. *Id.* While his physical therapist did not document Petitioner's pain levels on a numerical scale, he consistently recorded pain levels and decreased ROM severe enough to interfere with Petitioner's work, sleep, and other daily activities. *Id.* The PT records document significant ROM losses in addition to positive impingement testing and joint capsular restriction. *Id.* at *12-13. Although he only had eight PT sessions, he learned a home exercise program and his records document his compliance with the program, which he continued to do after his formal treatment ended. *Id.* at *13.

Petitioner was hesitant to receive a steroid injection because his left shoulder pain started with an injection. Mot. at *13. Dr. Gibbs accepted this rationale, advising that he avoid further injections. *Id.* To date, Petitioner has not had a steroid injection. *Id.* at *14. Concerning a surgical option, Petitioner emphasizes that none of his three MRIs have revealed any tearing or other pathology amenable to surgical correction. *Id.*

Petitioner's most recent treatment record, with Dr. Gibbs, reveals that he still has left shoulder pain at a level of five out of ten. Mot.. at *14. His pain and loss of motion continues to have a tangible, adverse effect on his life. *Id.* Petitioner asserts that his history is very similar to *Accetta*, and warrants the same award given to the petitioner in that case. *Id.* at *15. Unlike *Accetta*, there was no substantial delay in seeking initial treatment. *Id.* The *Accetta* petitioner transitioned to a home exercise program after nine PT visits, compared to eight in this case. *Id.* The *Accetta* petitioner also had two significant treatment gaps, for three and a half years and almost a year. *Id.* Petitioner suggests that his treatment gaps should not undercut the severity of his injury because his treating orthopedist did not order any additional PT and agreed with Petitioner's concerns about steroid injections, leaving only a surgical option. *Id.* at *16.

Petitioner argues that his SIRVA symptoms have persisted for more than five years, citing the December 2022 record. Mot. at *16-17. Petitioner states that he is not seeking future pain and suffering, but due to the duration of his symptoms he believes an award at or near the median is appropriate. *Id.* at *17.

Respondent counters that the proffered amount of $55,000.00 is an appropriate pain and suffering award. Respondent's Response, filed April 5, 2023, at *2 (ECF No. 51) ("Resp."). Respondent argues that Petitioner's clinical course was mild, consisting of only eight PT sessions in the six months after vaccination, during which he experienced improvement. Resp. at *8. At his final PT session, he was noted as having made good progress. *Id.* Respondent emphasizes the nine-month treatment gap from June 2018 to February 2019, during which time Petitioner was seen by his PCP multiple times, with no mention of left shoulder pain. *Id.* After briefly seeking care from February to May 2019, Petitioner then did not seek care again for 18 months, until November 2020. *Id.* Then, Petitioner had a third gap in treatment of *over two years*, between November 2020 and December 2022. *Id.* Respondent adds that the most recent care took place "only after a

ruling on entitlement had issued and the case was in damages." *Id.* at *8-9. In Respondent's view, the treatment gaps suggest Petitioner could cope with his injury, counseling a lower award. *Id.* at *9 (*citing Shelton v. Sec'y of Health & Human Servs.*, No. 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021)).

Respondent cites *Knauss*, *Dagen*, and *Murray*, in which the petitioner received pain and suffering awards of $60,000.00, $65,000.00, and $65,000.00, respectively, as comparable cases.[3] Resp. at *9-10. Respondent argues that in *Accetta*, the petitioner was a professional physical therapist and as a result, it was found to be reasonable based on her profession that she self-treated, explaining significant gaps in care. *Id.* at *10. In contrast, Mr. Parsons' gaps in care cannot be attributed to his profession or inability to receive recommended treatment. *Id.* Respondent views Petitioner's SIRVA as "mild, with minimal treatment and multiple lengthy gaps in treatment, which counsels in favor of a modest award." *Id.*

## V.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity

---

[3] *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018); *Dagen v. Sec'y of Health & Human Servs.*, No. 18-442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019); *Murray v. Sec'y of Health & Human Servs.*, No. 18-534V , 2020 WL 4522483 (Fed. Cl. Spec. Mstr. July 6, 2020).

of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision of the Court of Federal Claims several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* instead emphasized the importance of assessing pain and suffering by looking to the record evidence specific to the injured individual, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

### VI.  Prior SIRVA Compensation Within SPU[5]

#### A.  Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2023, 3,304 SPU SIRVA cases have resolved since the inception of SPU on

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

July 1, 2014. Compensation was awarded in 3,211 of these cases, with the remaining 93 cases dismissed.

1,834 of the compensated SPU SIRVA cases were the result of a reasoned ruling that petitioner was entitled to compensation (as opposed to a settlement or concession).[6] In only 173 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[8]

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *173* | *1,632* | *29* | *1,377* |
| **Lowest** | $40,757.91 | $22,500.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,203.12 | $62,825.18 | $90,000.00 | $38,134.81 |
| **Median** | **$92,299.83** | **$83,039.25** | **$130,000.00** | **$55,000.00** |
| **3rd Quartile** | $125,000.00 | $111,475.61 | $162,500.00 | $80,803.17 |

---

[6] The remaining 1,377 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (1,632 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

| Largest | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.   Pain and Suffering Awards in Reasoned Decisions

In the 173 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $215,000.00, with $90,000.00 as the median amount. Only seven of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[10]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In six cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### VII.   Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his

---

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

12

awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner initially had "severe" pain with normal ROM. His pain then appears to have continued at a somewhat reduced level, followed by the development of ROM restrictions and persistent pain that impacted his activities for a prolonged time. Petitioner suffered a mild to moderate SIRVA that is noteworthy for its duration, spanning over five years. During that time, however, there were three gaps in formal treatment of nine and a half months, 18 months, and two years. Although there are disparities in Petitioner's ROM as evaluated by his orthopedist and his physical therapist,[11] I find that the record supports the conclusion that Petitioner experienced moderate to severe restrictions in his ROM that improved with PT. His injury impacted his work as a veterinarian and on his family farm.

The case Petitioner cites, *Accetta*, is a good comparable, involving an injury of similar duration and treatment, also involving lengthy treatment gaps. In *Accetta*, the petitioner's orthopedist repeatedly recommended surgery. *Accetta*, 2021 WL 1718202, at *3-4. Mr. Parsons' orthopedist discussed surgery as an option if his condition persisted or worsened, and offered a referral for a second opinion. It does not appear that Mr. Parsons' orthopedist recommended surgery, but did seem to view it as a reasonable treatment option. The *Accetta* petitioner had a treatment gap of nearly three and a half years, suggesting a lengthy period of relief. While Petitioner had gaps in formal treatment, none were this long. Both petitioners had similar treatment, with the *Accetta* petitioner attending nine PT sessions compared to eight for Mr. Parsons. Both saw orthopedists and had MRIs, and neither had cortisone injections.

By contrast, the petitioners in the cases cited by Respondent all had at least one cortisone injection, compared to none for Mr. Parsons, and more sessions of PT. However, Respondent's cases involve injuries that were treated for a *significantly* shorter period of time, ranging from six months to a year.[12] There is a marked difference between a shoulder injury lasting a year or less and one that persists for five years, and the pain and suffering award should reflect that. I find that Petitioner's case is most similar to *Accetta*, though slightly less severe as exemplified by the repeated surgical recommendations in *Accetta*, and merits a slightly lower pain and suffering award.

---

[11] At a January 31, 2018 PT session, Petitioner's active ROM was measured as 86 degrees in flexion and 57 degrees in abduction. Ex. 6 at 18. Three days later, Dr. Gibbs recorded his active ROM as 175 degrees in flexion (a difference of 89 degrees) and 160 degrees in abduction (a difference of 103 degrees). Ex. 4 at 16. Fourteen days later, at a PT session, his passive ROM was documented as 117 degrees in flexion. Ex. 6 at 12.

[12] The *Dagen* petitioner sought care for just over six months, while the petitioners in *Knauss* and *Murray* sought care for approximately one year.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $90,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[13] **I also find that Petitioner is entitled to $1,416.18 in actual unreimbursable expenses.**[14]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $91,416.18, in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this decision.[15]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994))..

[14] The parties are in agreement as to damages for unreimbursable expenses. Mot. at 2; Resp. at 2. Petitioner states that he actually incurred unreimbursed medical expenses totaling $1,483.28, but "is willing to accept Respondent's calculation of past unreimbursable medical expenses of $1,416.18 thereby removing one potentially contested issue from this motion." Mot. at *10-11.

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.